# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Paul Bonfiglio,                                        Case No. 3:16CV2163

                 Plaintiff

          v.                                        **ORDER**

Toledo Hospital, et al.,

                 Defendant

This is an employment discrimination case under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.*, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.*, and the Ohio civil rights laws, O.R.C. §§ 4112.02, 4112.14, 4112.99.

Plaintiff Paul Bonfiglio worked at defendant ProMedica Toledo Hospital (TTH or the Hospital) [1] in Toledo, Ohio as a Unit Clerk/Nursing Assistant. During his employment, Bonfiglio sought and received intermittent leave under the FMLA to care for his wife's serious medical condition. In late August, 2014, Bonfiglio used his intermittent leave to take off on a Sunday he was scheduled to work. When he returned to work, Bonfiglio, his supervisor, and his department head engaged in a heated discussion after his supervisor inquired about how and when plaintiff planned to make up the weekend day, per Hospital policy. Bonfiglio later submitted a complaint about this meeting to ProMedica senior leadership, the legal department, and human resources.

---

[1] There appears to be some discrepancy between the parties about the correct name of defendant's facility. For purposes of this opinion, I adopt the defendant-hospital's version of its name.

The Hospital terminated Bonfiglio on December 4, 2015, citing a pattern of aggressive and rude behavior and insubordination during a late November, 2015 incident. At the time of his termination, Bonfiglio was on step two of the Hospital's four-step discipline policy. Previously, he had received counseling and coaching for behavior throughout his employment. He was sixty-one years old.

After Bonfiglio's termination, he filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). After the EEOC issued a right-to-sue letter, Bonfiglio timely filed this suit against the Hospital, his former supervisor Jennifer Hogrefe, and the Emergency Department Director, Beth Estep. Bonfiglio claimed that the Hospital fired him unlawfully due to his age and gender, in violation of Ohio public policy, and in retaliation for using FMLA-protected rights. He also alleged that defendants interfered with his FMLA rights by discouraging him from taking further FMLA leave. Finally, Bonfiglio alleged that defendants Hogrefe and Estep unlawfully aided and abetted one another in unlawful acts against him.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending is the Hospital's motion for summary judgment. (Doc. 25). For the following reasons, I grant the motion.

## Background

### A.     Bonfiglio's Employment With the Hospital

The Hospital hired Bonfiglio as a Unit Clerk in its Emergency Department in October, 2011. In that role, Bonfiglio performed mostly low-level administrative chores (*e.g.*, answering the phone, paging doctors, etc.). (Doc. 23-1, at 11). Sometime later, the Hospital combined the Unit Clerk position with a Nursing Assistant position, and Bonfiglio assumed that joint role. (Doc. 25-3 at 2, ¶ 3). As a Unit Clerk/Nursing Assistant, Bonfiglio performed both

administrative and clinical tasks, including checking patients' vital signs and transporting patients. (Doc. 20-1 at 8-12).

Bonfiglio reported to Patient Care Supervisor Jennifer Hogrefe. (*Id.* at 37). Hogrefe, in turn, reported to the Emergency Department Director, Beth Estep. (Doc. 20-1 at 37)

## B.    Bonfiglio's Intermittent FMLA Leave

Following his wife's surgery for a heart condition in the Summer of 2014, Bonfiglio requested intermittent FMLA leave to care for her. The Hospital approved the request, authorizing six months intermittent leave. (Doc. 23-1 at 30-33).

### 1.    The September 5, 2014 Meeting

On Sunday, August 31, 2014, Bonfiglio called off *per* his approved FMLA leave. On returning on his next scheduled workday, Bonfiglio found a letter in his workplace mailbox. The letter stated that, because plaintiff called off on a weekend day, the Hospital's weekend/holiday staffing/call-in policy required that he make up the missed shift. (Doc. 23-1 at 37; Doc. 23-4). The letter further explained that, if Bonfiglio neglected within the next seven days to choose a make-up day, a Patient Care Supervisor would choose one for him. (Doc. 23-4).

Unfamiliar with the referenced policy, on September 5, 2014, Bonfiglio asked Hogrefe for a copy. Later that day, she personally gave a copy to plaintiff. (Doc. 23-1 at 39).

As the letter stated, the policy provided that any employee who has called off on a weekend or holiday must later make up the missed shift. The policy applies equally to FMLA and other types of call-offs. (Doc. 23-6).

At the end of Bonfiglio's shift that day, Hogrefe stopped Bonfiglio in the hall as he walked past her office. Hogrefe asked Bonfiglio if he received a copy of the weekend/holiday call-off policy. Bonfiglio responded that he had. (Doc. 23-1 at 40-41). Hogrefe asked Bonfiglio

what he planned to do with the policy, and he responded by shrugging his shoulders and saying, "Nothing." (*Id.* at 41).

Hogrefe pressed Bonfiglio further about the policy, and he reiterated that he planned to do nothing. After some back-and-forth, each became silent. Bonfiglio, apparently believing the conversation was over, walked away and left for the employee locker room. (*Id.*)

After cleaning up for the day, Bonfiglio left the locker room, again passing Hogrefe's office. Hogrefe stopped Bonfiglio again, and he stood in her doorway. (*Id.* at 42). Hogrefe instructed Bonfiglio to come into her office because she wanted to talk to him, wanting to know "what [he] planned to do with the policy." (*Id.*at 42-43). Bonfiglio refused to leave the doorway, despite Hogrefe's repeated requests that he sit down. (*Id.* at 44).

As the exchange grew heated, Bonfiglio sought to have a human resources representative witness the meeting but found no one there (as it was 7:00 p.m.). He returned alone to Hogrefe's office. In the meantime, Hogrefe went to Estep to seek her intervention. Bonfiglio, Hogrefe, and Estep met in Estep's office. (*Id.* at 44-45).

The parties dispute how the meeting proceeded next. According to Bonfiglio, he sat in Estep's office while she yelled at him, saying things like, "you do this all the time," while pointing her finger in Bonfiglio's face. Meanwhile, according to Bonfiglio, Hogrefe stood at the opposite end of Estep's office, mocking him. (Doc. 23-1 at 46-47). Bonfiglio testified that during the meeting he, Hogrefe, and Estep did not discuss his FMLA time. (*Id.* at 53).

Defendants' account differs. According to Estep's affidavit, Bonfiglio "bec[a]me rude and argumentative with Ms. Hogrefe when she told him that he would need to make up the FMLA time he took on the weekend." Estep then "explained to Mr. Bonfliglio that this meeting was not about his use of FMLA time" and that he was free to disagree with Hogrefe, but "he

must do so in an appropriate manner, without becoming angry and aggressive with supervisors."
(Doc. 25-3 at 4, ¶ 14).

According to Bonfiglio, Estep told him at the conclusion of the meeting that she would think about discipline for him over the weekend. (Doc. 23-1 at 49-50).

### 2. Bonfiglio's Internal Complaint

On September 7, 2014, Bonfiglio sent an email to ProMedica senior leadership, the legal department, and human resources. The email, titled "FMLA INTERFERENCE" included Bonfiglio's account of the September 5th meeting and stated that he feared using additional FMLA leave. Specifically, Bonfiglio explained that he felt "that if [he] use[d] [his] FMLA time [he] will be bullied, harassed, and that [his] job performance will be put under a magnifying glass until [Hogrefe] can find a reason to fire me." (Doc. 23-7).

Human Resource Service Specialist Colleen Alexander emailed Bonfiglio about his message on September 10, 2014, expressing that she wished to meet with him about his concerns. In the resulting email exchange, Alexander explained to Bonfiglio that "ProMedica does not condone interference with FMLA rights or retaliation to an employee for the exercise of those rights." (Doc. 23-8).

Alexander met with Bonfiglio to hear his account of the events. During their meeting, Bonfiglio reiterated that he believed Hogrefe and Estep interfered with his FMLA rights. (Doc. 23-1 at 55-56).

Following her meeting with Bonfiglio, Alexander investigated further, interviewing both Estep and Hogrefe. (Doc. 25-2 at 2, ¶ 5). On concluding her investigation, Alexander met with Bonfiglio again to discuss her findings and recommendations. She gave to and reviewed with him a summary report. (*Id.* at 2, ¶ 4; Doc. 23-1 at 56, 58-59; Doc. 23-9). The summary reiterated

that "ProMedica does not condone interference with FMLA rights or retaliation for the exercise of those rights," and explained that "[w]e [at the Hospital] want you to use your IFMLA [*sic*] whenever it's needed." (Doc. 23-9).

The summary included five recommendations: 1) that Bonfiglio meet with Hogrefe and Estep with HR present "to clear the air and move forward"; 2) that Bonfiglio "will exercise his IFMLA [*sic*] rights without interference or retaliation by the organization"; 3) that Bonfiglio report directly to Patient Care Supervisor Josh Gwin instead of Hogrefe; 4) that human resources meet with Estep and Gwin "to discuss some issue(s) that have come up during the course of this investigation"; and 5) that Estep "will continue to mentor and develop [Hogrefe] in her supervisory role." (*Id.*).

Bonfiglio declined to meet with Hogrefe and Estep and to change supervisors. (*Id.*; Doc. 23-1 at 59-60). Bonfiglio and Alexander agreed that, going forward, he would document meetings with his superiors and email his summaries of those meetings "to HR as either an FYI or request that the situation be investigated." (Doc. 23-9).

### 3. Bonfiglio's Remaining FMLA Leave

Bonfiglio's FMLA approval remained in effect until late December, 2014. (Doc. 23-1 at 32-33). Bonfiglio continued to call off of work pursuant to his FMLA approval after Alexander's investigation concluded. (*See* Doc. 29-1 at 2, ¶ 6; Doc. 29-2). None of his requests for FMLA leave were denied. (Doc. 23-1 at 34). Bonfiglio did not renew his request for intermittent FMLA leave after the approval expired. (*Id.* at 66).

### C. Bonfiglio's Behavioral History and Termination

### 1. Hospital Recordkeeping and Disciplinary Procedures

Generally, Hospital personnel record interactions with employees, good or bad, in a dedicated employee communication log. That a supervisor or other personnel member makes a negative entry in an employee's log does not mean that employee received discipline for the underlying events. (*See* Doc. 25-3 at 2 ¶ 6).

The Hospital uses a four-step discipline policy. The four steps include: 1) verbal warning; 2) written reminder; 3) decision-making leave (DML); and 4) termination. The type of discipline ProMedica selects depends on the "type and severity of the offense and the employee's previous discipline. The policy does not require employees to progress through all four steps before being terminated." (Doc. 25-2 at 2, ¶ 6).

### 2. Bonfiglio's Behavioral History Before the September 4, 2015 Meeting

Between his hire and the September 5, 2014, meeting, Bonfiglio's disciplinary log reflects what defendants characterize as "rude, aggressive, threatening and argumentative" behavior. (Doc. 25-1 at 2). This includes aggressiveness toward coworkers (Doc. 25-6 at 1), and, in one instance, causing a coworker to cry (Doc. 25-3 at 4, ¶ 12), being argumentative with a supervisor (Doc. 25-6 at 2, 5) and with charge nurses (Doc. 25-3 at 4, ¶ 13), and refusing to cover for other employees while they were taking breaks (Doc. 25-6 at 2, 5). None of these incidents resulted in formal discipline.

On at least three occasions Hospital personnel offered Bonfiglio opportunities to attend training sessions on communication and similar skills. (Doc. 25-6 at 2, 3, 4). Bonfiglio did not avail himself of these opportunities, nor did the Hospital follow up on its offers to Bonfiglio regarding such training. (Doc. 23-1 at 18-19).

### 3. Bonfiglio's Disciplinary and Behavioral History After the September 5, 2014 Meeting

### a.      The Written Reminder

Bonfiglio's employee log indicates that after the September 5th meeting, despite additional coaching, his behavior remained similarly troublesome. These entries include, *e.g.*, rudeness on September 19, 2014 toward a Charge Nurse (Doc. 25-6 at 8); refusal on December 15, 2014, to help transport a patient when asked to do so, with the nurse reporting she was uncomfortable approaching Bonfiglio because he was aggressive (*id.* at 9); on December 17, 2014, walking away from his supervisor without acknowledging her when asked to assist nursing staff due to high volume activity, and, when his supervisor called to him, placing a hand on her arm, explaining, "I do this already, I find this very insulting." (*Id.* at 9-10).

Estep issued a written reminder to Bonfiglio following the two December incidents. (*See* Doc. 23-11). He unsuccessfully grieved the written reminder. (Doc. 23-1 at 85-87).

### b.      Bonfiglio's Termination

Despite the written reminder, Bonfiglio continued to exhibit conduct that defendants found unacceptable: namely, responding aggressively when addressed about taking multiple handfuls of crackers from an employee kitchen (Doc. 25-6 at 12) and acting rude toward a workplace educator (*id.* 25-6 at 13).

Bonfiglio's unacceptable behavior began to come to a head on November 27, 2015, when a nurse reported to Estep that Bonfiglio, in front of a patient, had thrown a blood pressure cuff on a hospital room floor. Later that day, Gwin reported that Bonfiglio had become angry with and acted aggressively toward him when Bonfiglio earlier had seen his assignment was to work in the Pediatrics zone that day.[2] (*Id.* at 16). Then, on November 29, 2015, Estep received

---

[2] Unit Clerks/Nursing Assistants are assigned to work in one of three zones: A pod, B pod, and Pediatrics. (Doc. 25-3 at 2, ¶ 3).

complaints about Bonfiglio's response to an overhead page requesting that he transport a patient. Bonfiglio reportedly aggressively approached the Unit Clerk who sent the page, telling her, "You will never call my name overhead," and then refused to transport the patient. (*Id.*)

Estep and Hogrefe met with Bonfiglio after the November 2015 series of incidents. Bonfiglio denied that he acted inappropriately. Estep investigated the incidents, placing Bonfiglio on administrative leave while the investigation remained pending. (Doc. 25-3 at 6, ¶ 24).

Estep interviewed three witnesses, including the nurse who witnessed the blood pressure cuff incident, Gwin, and the Unit Clerk who had paged Bonfiglio about the patient transfer. Estep then reviewed Bonfiglio's behavioral history with Andrews. Estep and Andrews concluded that Bonfiglio's pattern of aggressive behavior and his insubordination during the November 29th incident justified termination. (Doc. 25-3 at 6, ¶ 25).

The Hospital terminated Bonfiglio on December 4, 2015. (Doc. 28-12). He was sixty-one years old.[3] Bonfiglio unsuccessfully grieved his termination. (Doc. 25-3 at 6, ¶ 26).

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

The burden then shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56

---

[3] Defendants admitted in their Answer that Bonfiglio was sixty-one when the Hospital terminated him. (*See* Doc. 1 at 4, ¶ 9; Doc. 6 at 3, ¶ 9).

"requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

### A.    Discrimination Claims

Bonfiglio brings claims of gender and age discrimination. I assess each of these claims under the familiar *McDonnell Douglas* burden-shifting framework. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, Bonfiglio bears the burden to establish a *prima facie* case of discrimination. If he succeeds, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for Bonfiglio's termination. If defendants articulate such a reason, the burden shifts back to Bonfiglio to show that the proffered reason was not the real reason for its action, but is a pretext concealing discriminatory animus. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing *McDonnell Douglas*, *supra*, 411 U.S. at 802)).

To establish a *prima facie* case of discrimination, Bonfiglio must show that: 1) he is a member of a protected class; 2) he was discharged; 3) he was qualified for the position in question; and 4) he was replaced by a person outside the protected class. *Thompson v. City of Memphis*, 86 Fed. App'x 96, 101 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.* 964 F.3d 577, 582 (6th Cir. 1992)).[4]

### 1.    Reverse Gender Discrimination

---

[4] The same analytical framework applies to both federal and state discrimination claims. *See Nelson v. Ball Corp.*, 656 Fed. App'x 131, 134-35 (6th Cir. 2016) (internal citations omitted) (applying *McDonnell Douglas* framework to state and federal discrimination claims).

Bonfiglio alleges that defendants discriminated against him on the basis of his gender, male, in violation of Title VII and Ohio's antidiscrimination statutes.

Where, as here, a plaintiff brings a claim for "reverse discrimination" – that is, that he was discriminated against because he is a member of the *majority*, rather than the minority – plaintiff's burden is slightly modified.   *See Thompson*, *supra*, 86 Fed. App'x at 101. In such cases:

> The first prong is modified to require that the plaintiff demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority. The second and third prongs remain unchanged, but the fourth prong is also modified to require that the plaintiff show that he was treated differently than similarly situated employees of a different [gender]. … [M]atching modifications have been made under Ohio law for [such] claims.

*Nelson v. Ball Corp.*, 656 Fed. App'x 131, 134-35 (6th Cir. 2016) (internal quotations and citations omitted).

The parties dispute whether Bonfiglio has satisfied his *prima facie* burden. I find that he has not.

### a.    Bonfiglio Has Satisfied His Burden on the First *Prima Facie* Element

Bonfiglio argues that he has shown that he is in the "unusual" situation of having been the subject of discriminatory animus on the part of the two female decision-makers responsible for his firing. Moreover, he worked in a position "in which approximately ninety percent of [his] co-workers were female." (Doc. 28 at 12).

Defendants do not expressly address the modified burden. Instead, they argue that "statistical evidence of the gender .  .  . make-up of an employer's workforce is not probative on the issue of discrimination." (Doc. 25-1 at 25) (citing *Driggers v. City of Owensboro*, 110 Fed. App'x 499, 509 (6th Cir. 2004); *Hairston v. AK Steel Corp.*, 2004 WL3741621, at *8-9 (N.D. Ohio); *Smith v. Sec'y Veterans Affairs*, 2011 WL 3912105, at *9 (S.D. Ohio)).

I agree with Bonfiglio.

The Sixth Circuit has held that a plaintiff may satisfy the first element in a reverse discrimination case by showing the person who decided to take adverse action against the plaintiff is not a member of the majority class. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (race discrimination case). And this court previously held that a male plaintiff can satisfy this burden where the decision-makers are female in a predominantly female workforce. *Turner v. Grande Pointe Nursing Home*, 2007 WL 4365682,*4 (N.D. Ohio) (Oliver, J.).

Here, two women decided to end Bonfiglio's employment in a predominantly female workforce.[5] Therefore, Bonfiglio has met his burden on the first element of the *prima facie* case.

### b.      Bonfiglio Has Not Met His Burden on the Fourth *Prima Facie* Element

Bonfiglio argues he has met his burden of showing that his treatment differed from that of similarly situated women who "had disrespected him or were speaking to him in an aggressive manner" without any resulting discipline. (Doc. 28 at 13). Defendants deny that contention and respond that they investigated Bonfiglio's complaints and took appropriate action and that the Hospital has disciplined female workers for conduct similar to Bonfiglio's. (Doc. 29 at 3-4).

Bonfiglio has not shown that the women to whom he compares himself are similarly situated to him. Therefore, he has not met his burden on the fourth element.

---

[5] There seems to be confusion between the parties about whether Estep and Hogrefe made the termination decision or Estep and Alexander made that decision. (*See* Doc. 28 at 12 ("Furthermore, the decision-makers at issue here are both female, Ms. Estep and Ms. Hogrefe."; Doc. 25-2 (explaining Alexander and Estep decided to terminate Bonfiglio)). In any event, the parties do not dispute that two women decided to fire the plaintiff.

"A plaintiff must show that employees who are alleged to be similarly situated are similarly situated in *all* respects." *Thompson*, *supra*, 86 Fed. App'x at 102 (emphasis supplied) (citing *Mitchell*, *supra*, 964 F.2d at 583)). Accordingly, "the individuals with whom plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, *supra*, 964 F.2d at 583.

"Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton Cty.*, 23 Fed. App'x 318, 325 (6th Cir. 2001) (internal citations omitted). Therefore, the Sixth Circuit has held that a plaintiff with a background of behavioral issues fails to meet the *prima facie* burden where the purported comparators do not have such a background. *See, e.g.*, *Tartt v. City of Clarksville*, 149 Fed. App'x 456, 462 (6th Cir. 2005) (comparators not similarly situated where plaintiff had "a spotty discipline record" whereas comparators had "spotless disciplinary record[s]" or the record contained no evidence of comparators' disciplinary history); *Thompson*, *supra*, 86 Fed. App'x at 102 (holding, in reverse discrimination case, that plaintiff failed to satisfy his *prima facie* burden because he did not know whether his female comparator had a disciplinary record similar to his own); *Hardman v. Univ. Akron*, 40 Fed. App'x 116, 119 (6th Cir. 2002) (holding, in reverse discrimination case, that plaintiff failed to establish *prima facie* case of discrimination because, in part, proposed comparator had no prior discipline but plaintiff had a disciplinary record).

Defendants fired Bonfiglio for a pattern of rude and aggressive behavior, despite repeated counseling and a written reminder, and for insubordination. To be sure, Bonfiglio's

communication log does show that, on certain occasions, he complained that female employees were rude to him (*see* Doc. 25-6 at 4 (referencing communications on 3/27/14), 5 (8/20/14), 14 (8/7/15), and 15 (10/1/15)). Bonfiglio fails, however, to introduce evidence that those employees had any record of behavioral or disciplinary issues, much less that any such record was as substantial as his own. Bonfiglio has failed, then, to demonstrate that these women are similarly situated to him.[6]

Further, defendants have introduced evidence that the Hospital treated at least one female comparator the same as the plaintiff for similar conduct: "a female Unit Clerk/Nurse Assistant . . . was terminated for multiple instances of rude behavior toward supervisors and insubordinate conduct." (Doc. 25-2 at 3, ¶ 11). Therefore, I find no merit in Bonfiglio's argument that the Hospital treated him more severely than similarly situated women employees who engaged in the same or substantially similar misconduct.

### 2.    Age Discrimination

Bonfiglio also claims defendants discriminated against him based on his age.

### a.    Bonfiglio Has Met His *Prima Facie* Burden for His Age Discrimination Claim

To meet their *prima facie* burden, plaintiffs claiming age discrimination must show "replacement not by a person outside the protected class [of individuals age forty or older], but merely replacement by a significantly younger person." *See Grosjean v. First Energy Corp.*, 349

---

[6] Moreover, the records in the communication log indicate that Hospital personnel investigated Bonfiglio's complaints and, as needed, took action to address the offending behavior. (*See* Doc. 25-6 at 4-5, 14-15). Further, Bonfiglio himself exhibited rude behavior in response to his coworkers and his supervisors, including in meetings his supervisors held to address his complaints. (*See id.* at 4-5 (Bonfiglio raises his voice during meeting with supervisor addressing Bonfiglio's complaint, causing his coworker to cry)). Additionally, Bonfiglio abandoned some of his complaints (*See id.* at 4, 14), and, in at least one such instance, Hospital personnel still took remedial action, moving the other employee to another area of the Hospital (*id.* at 14).

F.3d 332, 335 (6th Cir. 2003) (internal citations omitted). Generally, a person who is at least ten years younger than the plaintiff is significantly younger than the plaintiff. *See id.* at 336-37 (collecting cases).

Bonfiglio argues he has met his *prima facie* burden because his replacement[7] was significantly younger than he. (Doc. 28 at 13-14). Defendants counter that Bonfiglio failed to point to any evidence, such as comments about his age, of age discrimination. (Doc. 25-1 at 24-25). I agree with Bonfiglio that such overt expressions of age animus are not necessary in this case.

The employee who replaced Bonfiglio was thirteen years younger than he when the Hospital fired him. (*See* Doc. 25-2 at 4, ¶ 12). This satisfies the "significantly younger" requirement. *See Grosjean*, *supra*, at 336-37. Bonfiglio, therefore, has satisfied his burden, and the burden shifts to defendants.

### b.    Bonfiglio Has Not Shown Pretext

Defendants have articulated a legitimate, nondiscriminatory reason for Bonfiglio's termination: namely, Bonfiglio's insubordination in November, 2015, and that such behavior followed several other incidents of misconduct involving his coworkers. (*See* Doc. 29-4 at 2, ¶ 4).

In light of that explanation of legitimate, non-discriminatory grounds, the burden shifts to Bonfiglio to "produce sufficient evidence from which the jury may reasonably reject the employer's explanation" as a pretext masking discriminatory motivation. *E.g.*, *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A plaintiff may show

---

[7] While Bonfiglio argued in his brief that Steven Szelepski did not replace him, Alexander's affidavit shows that this claim is unfounded. (*See* Doc. 29-1 at 2, ¶ 3 (explaining that Szepelski filled the same unique position number that Bonfiglio held during his employment)).

pretext by demonstrating that: 1) "the proffered reasons had no basis *in fact*"; 2) "the proffered

reason did not *actually* motivate his discharge"; or 3) "they were *insufficient* to motivate

discharge." *Id.* at 1084. Bonfiglio proceeds under the first and third methods.

### i. Bonfiglio Cannot Show Pretext Because Defendants Honestly Believed Its Reasons for Terminating Him Were True

"The first method [of showing pretext] is essentially an attack on the credibility of the

employer's proffered reason." *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. App'x 783, 791

(6th Cir. 2006). This means that the plaintiff must show "that the employer did not actually have

cause to take adverse action against the employee based on its proffered reason," and,

accordingly, the proffered reason is false. *Id.* The employer can overcome such a showing by

demonstrating that it "reasonably reli[ed] on particularized facts that were before it at the time

the decision was made;" this is known as the "honest belief rule." *Id.* (internal citation and

quotations omitted).

Bonfiglio argues that defendants' stated reason has no basis in fact because defendants

have not shown that Bonfiglio threatened others or was hostile at work. (*See* Doc. 28 at 15).

Defendants counter that Bonfiglio mischaracterizes the reason for his termination, and that

defendants, in fact, terminated him "for a pattern of behavior, that included condescending, rude,

and argumentative conduct … and insubordination." (Doc. 29 at 9).

I agree with defendants and find that their investigation into Bonfiglio's conduct

demonstrated an honest belief that termination was appropriate.

Bonfiglio repeatedly engaged in the behavior that, in time, led to defendants' decision to

terminate him. His communication log documents rude, aggressive, and insubordinate conduct

and the defendants' repeated attempts to counsel and coach him. He did not accept those

opportunities. Even after receiving a written reminder, Bonfiglio's disruptive misconduct continued. The proverbial straw came after those incidents, when he engaged in yet additional acts of insubordination.

That Bonfiglio denied – and continues to deny – that he engaged in insubordinate conduct on November 27 and 29, 2015, does not show pretext.

"The key inquiry in assessing whether an employer holds … an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Parks v. UPS Supply Chain Sols., Inc.*, 607 Fed. App'x 508, 515 (6th Cir. 2015) (internal quotations and citations omitted).

After learning about the last incident, Estep reviewed witness interviews and Bonfiglio's version of the events with Colleen Alexander. Together, they decided Bonfiglio's conduct justified termination. (*See* Doc. 29-4 at 10, ¶ 32).

In light of this informed and considered decision, Bonfiglio had to produce "evidence which demonstrates that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Id.* (internal quotations and citations omitted). "[U]nsupported denial[s] of wrongdoing" are not enough to rebut an employer's honest belief. *Id.* But Bonfiglio has simply "denied the allegations against him that led to his termination." (Doc. 28 at 15). Not having gone beyond his bald denial, Bonfiglio cannot overcome defendants' honest belief.

### ii. Bonfiglio Has Not Offered Evidence to Show Defendants' Reasons Were Insufficient to Motivate His Discharge

The third way to demonstrate pretext "admits that the [employer's stated] reason [for the adverse action] could motivate the employer but argues that the illegal reason is more likely than

the proffered reason to have motivated the employer." *Joostberns*, *supra*, 166 Fed. App'x at 791. "This method . . . requires the plaintiff to submit additional evidence. A plaintiff must offer evidence sufficient to allow a reasonable juror to find that the employer was motivated by illegal reasons considering both the employer's stated reasons and evidence the employer offers in support of such reasons." *Id.* (internal citation omitted).

Bonfiglio first argues that defendants' reason is pretextual because, without explanation, they jumped over two intermediate steps in the Hospital's discipline policy to fire him. Defendants respond that Bonfiglio's conduct on November 29, 2015, fell within the range of offenses justifying termination. Moreover, the Hospital's employees do not need to, and are not entitled to, ascend (or descend, as the case may be) each of the four disciplinary steps sequentially before reaching the top (or bottom) level of termination. (Doc. 25-2 at 6). I agree with defendants.

The level of discipline under Hospital policy depends on the type and severity of the offense and the employee's disciplinary history. (Doc. 25-2 at 3, ¶ 9). Among the grounds for termination, regardless of prior disciplinary history, under the Hospital's policy are "[d]iscourtesy to or improper treatment of an employee, visitor, patient, or other behavior inconsistent with customer service." (Doc. 29-1 at 3, ¶¶ 8-9; Doc. 29-3 at 10).

Defendants' investigation showed Bonfiglio exhibited insubordinate behavior in late November, 2015. Accordingly, his conduct justified termination under the policy. Bonfiglio's behavioral and disciplinary history underscores his termination's appropriateness.

Next, Bonfiglio argues that similarly situated younger female employees were treated more favorably than he after engaging in similar misconduct. (Doc. 28 at 16). But, as explained

above, Bonfiglio has not put forth evidence showing that any other employees conducted themselves or had disciplinary histories, if any at all, like those the record shows he had.

In essence, Bonfiglio's claims comes down to his personal belief that what he did did not justify his loss of his job. But it is not up to an employee to decide unilaterally what conduct is or is not acceptable to the employer. That is the employer's prerogative, especially in a hospital setting, where cooperative interaction with coworkers, visitors, and, most importantly, coworkers is a *sine qua non* of a hospital's mission and obligation to those whom it serves. Too much can be at stake to tolerate any employee who refuses willy-nilly to do his or her job when called on to do so. Such refusal can, as it properly did here, lead forthwith to termination without recourse to preliminaries – which, in any event, the Hospital undertook to no avail.

## B. FMLA Claims

"There are two distinct theories of recovery on FMLA claims: the 'entitlement' or 'interference' theory, and the 'retaliation' or 'discrimination' theory." *Hurtt v. Int'l Servs., Inc.*, 627 Fed. App'x 414, 424 (6th Cir. 2015). Bonfiglio raises a claim under each theory.

### 1. FMLA Retaliation

The FMLA prohibits employers from retaliating against individuals for exercising their FMLA rights. *See* 29 U.S.C. § 2615(b).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims. To make out a *prima facie* FMLA retaliation claim, Bonfiglio must show: 1) he exercised a right protected under the FMLA; 2) Defendants knew he exercised that right; 3) he suffered an adverse employment action; and 4) a causal connection exists between the exercise of the protected right and the adverse employment action. *Stein v. Atlas Indus., Inc.*, 730 Fed. App'x 313, 318-19 (6th Cir. 2018).

The parties dispute only the fourth element. Plaintiff argues that the temporal proximity between his termination and his protected activity "or other indicia of retaliation" demonstrates causation. (Doc. 28 at 19). Defendants argue that the temporal gap between his protected activity and his termination is too long to establish a causal connection. In addition, defendants assert that Bonfiglio has not otherwise shown a retaliatory motive. (Doc. 25-1 at 16; Doc. 29 at 13). I agree with defendants.

Temporal proximity may establish causation where the adverse action occurred "very close in time" to the protected activity. *See Stein*, *supra*, 730 Fed. App'x at 319 (internal quotations and citations omitted). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the *employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality*." *Blosser v. AK Steel Corp.*, 520 Fed. App'x 359, 364 (6th Cir. 2013) (emphasis supplied in original) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008)).

Here, the temporal gap was about fifteen months from Bonfiglio's complaint about the chilling effect of the September 5, 2014, meeting and his firing. And just under one year passed between the last date Bonfiglio used FMLA leave and his termination. (*See* Doc. 29-1 at 2, ¶ 6 (last FMLA date was December 19, 2014)). Bonfiglio must, therefore, introduce other evidence of retaliatory conduct. *See Stein*, *supra*, 710 Fed. App'x at 319 (requiring additional evidence of retaliation where ten weeks passed between protected activity and adverse action).

Bonfiglio argues that Estep's and Hogrefe's behavior in the September 5, 2014, meeting demonstrates an anticipatory retaliatory motive. (*See* Doc. 28 at 20 ("[Bonfiglio] was threatened with discipline during a meeting regarding his FMLA leave. Ms. Hogrefe also mocked Mr. Bonfiglio's speech mannerisms in the same meeting.") (internal citations omitted)). Such

evidence, aside from its conclusory subjectivity, is too remote in time to Bonfiglio's December, 2015 termination to manifest retaliation. *See Daidone v. FCA Transport LLC*, Civil Action No. 17-CV-10348, 2018 WL 1784499, *5 (E.D. Mich.) (comment that HR was "watching [plaintiff's] FMLA not indicative of retaliatory motive where HR representative made comment at least one year before plaintiff's discharge).

Bonfiglio also points to his communication log as evidence of a retaliatory motive, noting that he "received thirteen (13) entries in his log within a month of his complaint." (Doc. 28 at 20). But more than one year passed between those entries and Bonfiglio's termination, negating any inference of retaliatory motive. *See Daidone*, *supra*, at *5.

Moreover, the entries themselves rebut Bonfiglio's argument. Five of the purportedly offending entries predate his internal complaint of chilling effect, and, in some instances, merely document what occurred during the September 5th meeting. (*See* Doc. 25-6 at 5-6). Then, three entries deal with resolving the complaint itself. (*Id.* at 7-8). Plus, two of the entries simply note when Bonfiglio would make up his two missed weekend shifts.[8] (*Id.* at 9). The remaining three entries appear to be recording complaints from other employees about Bonfiglio. (*See id.* at 7-9). These entries do not, as Bonfiglio would like me to infer, imply that defendants were monitoring him more closely out of retaliation for his complaint.

Finally, Bonfiglio again offers his complaints about coworkers for similar behavior as evidence of retaliatory motive, citing his communication log. But he provides no evidence that these individuals are similarly situated to him. Indeed, the communication log does not indicate, one way or the other, these individuals' FMLA status. (*See generally* Doc. 25-6). Bonfiglio

---

[8] Bonfiglio called off on September 13, 2014, also on a weekend. (*See* Doc. 25-6 at 8).

therefore cannot use these complaints as evidence that defendants retaliated against him for exercising his FMLA rights. *See Parks*, *supra*, 607 Fed. App'x at 515-16.

## 2. FMLA Interference

The FMLA bars employers from "interfere[ing] with, restrain[ing] or deny[ing] the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). Generally, to succeed on an "interference" claim, a plaintiff must show that:

> (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.

*Hurtt*, *supra*, 627 Fed. App'x at 424 (internal citation omitted).

Bonfiglio argues that defendants interfered with his FMLA rights by "discourag[ing] him from taking FMLA leave." (Doc. 28 at 17). Defendants argue, in part, that Bonfiglio's FMLA interference claim must fail because he continued to use FMLA leave after the September 5, 2014, meeting and his resulting internal complaint. (Doc. 29 at 12-13). I agree with defendants.

"[I]nterfering with the exercise of an employee's rights under the FMLA includes discouraging an employee from using FMLA leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (internal quotations omitted) (quoting 29 C.F.R. § 825.220(b)). "Courts require a plaintiff pursuing a discouragement theory to offer evidence she tried to assert her FMLA rights and was discouraged, unless the employer's actions would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise her FMLA rights." *Vess v. Scott Med. Corp.*, No. 3:11CV2549, 2013 WL 1100068, *2 (N.D. Ohio). That an employer's conduct might "chill" use of FMLA leave is not enough unless plaintiff "offer[s] evidence that it, in fact, caused her or any other employee to refrain from requesting or using

FMLA leave." *Santoli v. Vill. of Walton Hills*, No. 1:12CV1022, 2015 WL 1011384, *5 (N.D. Ohio).

Bonfiglio has not met this fairly demanding burden. Critically, the evidence in the record shows that Bonfiglio continued to use FMLA leave after the September 5, 2014, meeting and his ensuing internal complaint. Indeed, defendants submit affidavits and scheduling records showing that Bonfiglio took FMLA leave nine more times before his leave approval expired. (Doc. 29-1 at 2, ¶ 6; Doc. 29-2).[9] Bonfiglio has not shown, then, that defendants' conduct dissuaded him from exercising his FMLA rights. *See Santoli*, *supra*, 2015 WL 1011384 at *5 (granting summary judgment on FMLA interference claim where plaintiff offered no evidence showing employer's conduct caused plaintiff or others to refrain from using FMLA leave); *Mueller v. J.P. Morgan Chase & Co.*, No. 1:05CV560, 2007 WL 915160, *14 (N.D. Ohio) (granting summary judgment where plaintiff continued to use FMLA leave after supervisor "harassed" her for using such leave by requiring doctor's notes for each leave request).

## C.     Remaining Claims

Plaintiff has not address his other wrongful discharge claims. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013).

---

[9] Bonfiglio could not recall at his deposition whether he used additional FMLA leave after the September 5th meeting. The timekeeping records defendants submit, however, conclusively show he took such leave on September 13, 2014, October 1, 2014, October 2, 2014, October 3, 2014, October 26, 2014, October 27, 2014, November 26, 2014, December 12, 2014, and December 19, 2014. (Doc. 29-1 at 2, ¶ 6; Doc. 29-2).

Bonfiglio not having responded to defendants' arguments as to either his claim for wrongful discharge in violation of public policy or his claim for aiding and abetting, the defendants are entitled to summary judgment as to those claims as well.

## Conclusion

It is, therefore,

ORDERED THAT Defendants' ProMedica Toledo Hospital, Beth Estep, and Jennifer Hogrefe motion for summary judgment (Doc. 25) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge